STEVEN KALAR
Federal Public Defender
DANIEL P. BLANK
Senior Litigator
450 Golden Gate Avenue
San Francisco, California  94102
Telephone: (415) 436-7700
Facsimile: (415) 436-7706
Email: Daniel_Blank@fd.org

Counsel for Defendant RAMOS-VELASQUEZ

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 19-0503 EMC |
| Plaintiff, | **SENTENCING MEMORANDUM** |
| v. | **Court:** Hon. Edward M. Chen |
| ANIVAL RAMOS-VELASQUEZ, | **Date:** January 22, 2020 |
| Defendant. | **Time:** 2:30 p.m. |

**INTRODUCTION**

Defendant Anival Ramos-Velasquez, who first came to the United States from Honduras at age 14, has demonstrated extraordinary acceptance of responsibility for his offense of selling $20 worth of heroin to an undercover police officer, and respectfully requests that the Court vary downward under the factors of 18 U.S.C. § 3553(a) from the U.S. Sentencing Guideline Zone B range of 6 to 12 months and impose upon him a sentence of time served (effectively 4 months imprisonment).

**BACKGROUND**

Anival Ramos-Velasquez was born in 1998 in the capital city of Tegucigalpa, Honduras. *See* PSR ¶ 32. Unfortunately, he and his parents soon had to flee to the countryside due to the incursion of dangerous and violent gangs into their neighborhood. *See id.* ¶ 33.[1] At age 12, Mr. Ramos' parents separated and he went to live with this mother. *See id.* However, when his mother started dating another man, the situation at home became toxic and, at age 14, rather than return to the violence in Tegucigalpa, Mr. Ramos emigrated with friends to the United States and went to live with his aunt in Atlanta. *See id.* ¶ 34. Mr. Ramos went to school in Atlanta, but had to drop out in the ninth grade to support his family financially, working side jobs doing construction, remodeling and painting for cash payment due to his undocumented status. *Id.* ¶¶ 40, 42. At age 19, Mr. Ramos moved to the Bay Area where he continued to do similar work until his arrest in the instant case on October 22, 2019. *Id.* ¶¶ 4, 34, 42.

Following his initial appearance in federal court, Mr. Ramos was granted pretrial release to the hallway house, to be effective once bed-space opened up. *Id.* ¶ 4. However, Mr. Ramos later withdrew his request for release, offering up his space to the long line of defendants on the waiting list, and his release order was thereupon administratively revoked. *See id.* As such, Mr. Ramos has been in continuous custody since October 22, 2019. *Id.* He promptly pleaded guilty without the benefit of any plea agreement on November 6, 2019. *Id.* ¶ 2.

---

[1] Due to the gangs, Tegucigalpa has become one of the most violent cities in the world. *See, e.g.,* Central America Refugee Crisis, UNITED NATIONS REFUGEE AGENCY (available at https://www.unrefugees.org/emergencies/central-america).

1

**ARGUMENT**

Mr. Ramos agrees with the calculation of the U.S. Probation Officer that the applicable U.S. Sentencing Guideline range is 6 to 12 months, based upon Offense Level 10 and Criminal History Category I (no prior convictions of any kind), in Zone B of the Sentencing Table. As noted in the Presentence Report, "[s]ince the applicable guideline range is in Zone B of the Sentencing Table, the Court may impose probation with a condition or combination of conditions requiring intermittent confinement, community confinement, or home detention." PSR ¶ 47. However, as Mr. Ramos does not have permission to be in this country, despite having first emigrated here at age 14, he is not eligible for any of those preferable alternatives to imprisonment expressly recognized in the guidelines.

Instead, under the factors of 18 U.S.C. § 3553(a), Mr. Ramos respectfully requests that the Court vary downward from the low end of the advisory guideline range to a sentence of "time served" (effectively four months imprisonment) due to his extraordinary acceptance of responsibility, both in terms of the withdrawal of his request for release and his early guilty plea, as well as due to the difficult conditions in Honduras which led Mr. Ramos to seek employment here in the United States. As set forth in the Background section above, Mr. Ramos first came to the United States from Honduras because the gang violence in Tegucigalpa eliminated any realistic opportunity of gainful employment there. Although this fact does not excuse Mr. Ramos' criminal conduct, it does provide an important perspective, especially when considering the role in creating those violent conditions in Honduras played by the same federal government prosecuting him here.

Honduras is a dangerous and violent country with one of the highest murder rates in the world. *See* Honduras 2018 Crime & Safety Report, OVERSEAS SECURITY ADVISORY COUNCIL (available at https://www.osac.gov/Pages/ContentReportDetails.aspx?cid =23798) [hereinafter 2018 Crime & Safety Report]; *see also* Gangs in Honduras, INSIGHT CRIME (available at https://www.insightcrime.org/images/PDFs/2015/HondurasGangs.pdf) [hereinafter Gangs in Honduras] at 1 ("In 2014, Honduras was considered the most violent nation in the world that was not at war."). Tegucigalpa, the capital of Honduras, and San Pedro

Sula, the country's economic center, are two of the ten most dangerous cities in the world. Central America Refugee Crisis, UNITED NATIONS REFUGEE AGENCY (available at https://www.unrefugees.org/emergencies/central-america/); *see also* Gangs in Honduras at 1. According to the 2017 State Department Human Rights Report, violence in Honduras includes "murder, extortion, kidnapping, torture, human trafficking, intimidation, and other threats . . . ." Country Report of Human Rights Practices for 2017, Honduras, U.S. DEP'T OF STATE, BUREAU OF DEMOCRACY, HUMAN RIGHTS AND LABOR (available at https://www.state.gov/documents/organization/277585.pdf) at 1.

Although there are many reasons for the high crime and murder rates, political instability and gang activity have contributed to the violence for decades. In the 1980's, the United States used Honduras to base American soldiers as they fought against the Nicaraguan government. *Id.* Neighboring countries Guatemala and El Salvador, also endured internal wars that left the countries unstable. *Id.* Because many were left unemployed and weapons were readily available, criminal groups began to form throughout Central America. *Id.* According to the Wilson Center, crime generally goes unreported because of corruption, weak law enforcement, and active criminal groups. *See* Cristina Eguizábal et al., Crime and Violence in Central America's Northern Triangle, WILSON CTR RPT. ON AMERICAS (available at https://www.wilsoncenter.org/sites/default/files/FINAL%20PDF_CARSI%20REPORT_0.pdf [hereinafter Crime and Violence] at 1-2. In 2009, a military coup ousted Honduras President Zelaya making Honduras the first Central American country to undergo a coup in nearly two decades, and in 2017, the most recent Honduran presidential election came under question as many organizations noticed irregularities with the results. *See* Central America's Violent Northern Triangle; *see also* Honduras: Guarantee Credibility of Elections, Protect Free Expression, HUMAN RIGHTS WATCH (Dec. 2017) (available at https://www.hrw.org/news/2017/12/11/honduras-guarantee-credibility-elections-protect-free-expression). Because of the instability and unrest within Honduras, the United States has issued warnings cautioning travel there since 2012. *See* 2018 Crime & Safety Report. These

/ / /

1  travel warnings are indicative of the safety concerns in the country and why many are fleeing in
2  hopes of creating more sustainable lives.
3    Gang violence is also responsible for the violence throughout Honduras.  Since the
4  1990's, the United States has played a significant role in Honduran gang culture.  *See* Gangs in
5  Honduras at 1.  Mara Salvatrucha (MS-13), the 18th Street gang (M-18), and Barrio 18, three
6  gangs that originated in Los Angeles, are now three of the most prevalent gangs in the country.
7  *See* Clare Ribando Seelke, Gangs in Central America, CONG. RES. SER., 3 (Aug. 29, 2016)
8  (available at https://fas.org/sgp/crs/row/RL34112.pdf); *see also* Gangs in Honduras at 1.  These
9  gangs expanded into Honduras after the United States passed legislation in 1996 that led to the
10 deportation of many undocumented immigrants with criminal records.  *See* Gangs in Honduras
11 at 1.  Although sources vary as to how many gang members are currently active, estimates
12 range between 5,000 to 36,000 members.  *Id.* at 7.  These U.S.-based gangs, along with local
13 gangs, use extortion and violence to control territories and comminutes.  *See* Crime and
14 Violence at 1-2; *see also* Rocio Cara Labrador & Danielle Renwick, Central America's Violent
15 Northern Triangle, COUNCIL ON FOREIGN REL. (June 26, 2018) (available at
16 https://www.cfr.org/backgrounder/central-americas-violent-northern-triangle) [hereinafter
17 Central America's Violent Northern Triangle].  As a result, life in Honduras is tenuous, and
18 violence is a primary reason why many people like Mr. Ramos must flee the country in order to
19 find a life where they can be safe and find economic opportunity.  *See* Central America's
20 Violent Northern Triangle.
21   Despite these dangers in the country to which he will certainly be deported following
22 the resolution of the instant case, Mr. Ramos has demonstrated extraordinary acceptance of
23 responsibility.  Along similar lines, the Presentence Report affirmatively recognizes the
24 circumstances that led Mr. Ramos to leave his mother's house at age 14 and emigrate from
25 Honduras to the United States, as well as his lack of any prior criminal convictions, as factors
26 potentially warranting a downward variance.  *See* PSR ¶ 65.  As none of the preferable
27 alternatives to imprisonment expressly recognized by the U.S. Sentencing Guidelines based
28 / / /

upon the Zone B guideline range here are available for Mr. Ramos, the Court should instead vary downward under the factors of § 3553(a) to a term of imprisonment of "time served."

## CONCLUSION

For the aforementioned reasons, the Court should sentence Mr. Ramos to a term of imprisonment of "time served," effectively four months imprisonment.

Respectfully submitted,

Dated:   January 15, 2020

STEVEN KALAR
Federal Public Defender
Northern District of California

　　　　　　　　／S　　　　　　　　
DANIEL P. BLANK
Assistant Federal Public Defender